## COMMONWEALTH *vs.* CHRIS J. WOLINSKI.

Bristol. December 8, 1999. - April 13, 2000.

Present: MARSHALL, C.J., ABRAMS, GREANEY, IRELAND, & COWIN, JJ.

*Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Practice, Criminal,* Admissions and confessions, Motion to suppress, Instructions to jury, Voluntariness of statement, Judicial discretion, New trial, Duplicative convictions, Lesser included offense, Capital case. *Evidence,* Admissions and confessions, Voluntariness of statement. *Intoxication. Homicide. Robbery. Assault and Battery by Means of a Dangerous Weapon. Felony-Murder Rule.*

There was no error in a Superior Court judge's findings that a criminal defendant was neither physically nor mentally impaired as a result of any intoxication, or his conclusion that the defendant's waiver of Miranda rights was voluntary and that his statement to police was voluntary. [231-233]

At a criminal trial, the judge did not abuse his discretion by not repeating, in a supplemental instruction responding to questions by the jury, a statement on the Commonwealth's burden of proof, where there was nothing in the judge's supplemental instruction that would have changed the jury's understanding of that burden, which the judge had repeatedly emphasized in the main charge. [233-234]

The statement of a witness in a criminal case did not constitute new evidence for purposes of a motion for a new trial, where it was known to the defendant at the time of his trial; moreover, the statement did not cast doubt on the defendant's involvement in the assault and robbery that preceded the victim's death [234-237]; further, the motion judge acted within his discretion in deciding the motion without an evidentiary hearing [237-238].

A conviction of assault and battery by means of a dangerous weapon was not duplicative of a condition of armed robbery, which was the underlying felony for a conviction of murder in the first degree based on a theory of felony-murder, nor was it duplicative of the felony-murder conviction. [238-239]

INDICTMENTS found and returned in the Superior Court Department on November 4, 1992.

A pretrial motion to suppress evidence was heard by *James F. McHugh,* J.; the cases were tried before *Richard J. Chin,* J., and a motion for a new trial was heard by him.

*James A. Couture* for the defendant.

*James A. Janda*, Assistant District Attorney, for the Commonwealth.

MARSHALL, C.J. The defendant, Chris J. Wolinski, was convicted by a jury of murder in the first degree based on a theory of felony-murder, on the underlying felonies of armed robbery and unarmed robbery. The jury also convicted him of armed robbery and of assault and battery by means of a dangerous weapon. He received a life sentence for the murder conviction, and a sentence of from nine to ten years for each of the two other convictions, to run concurrently.

The defendant appealed from the convictions, and later filed a motion for a new trial based on newly discovered evidence. The motion for a new trial was denied, from which the defendant has also appealed. We affirm the denial of the motion for a new trial. We vacate the defendant's conviction of armed robbery, and affirm his convictions of first degree felony-murder and assault and battery by means of a dangerous weapon. We see no reason to order a new trial or to reduce the murder verdict pursuant to G. L. c. 278, § 33E.

1. We summarize the evidence viewed in the light most favorable to the Commonwealth. See *Commonwealth* v. *Nieves*, 429 Mass. 763, 764 (1999). The defendant lived with his girl friend, Tammy Piche, in a first-floor apartment on Ashley Boulevard in New Bedford. Jason Lorenzi and Jody Camara lived in a second-floor apartment there. On September 27, 1992, immediately after or during the defendant's beating of the victim, Juan Quila Alonzo, the victim was thrown or forced out of a third-floor window of the apartment building, falling to a sidewalk twenty-seven feet below. Alonzo subsequently died as a result of "[m]ultiple blunt trauma" according to the medical examiner.[1]

Earlier that evening, the defendant and Piche had been at a New Bedford bar where they concocted a plan by which Piche would pretend to be a prostitute, leave with a man from the bar, get money from him, and then jump out of the taxicab before

---

[1]The medical examiner testified that the injuries to the victim included bruises on the right shoulder and chest, multiple bruises on the lungs, multiple hemorrhages in the head area, fractures of the skull, and fractures of the facial bones. The victim's facial features were destroyed due to blunt trauma. Hemmorhaging inside the skull was such that the internal bleeding squashed the brain down causing it to become "nonfunctional" — a "major component" of the victim's death, according to the medical examiner.

they had sexual relations. The defendant agreed he would follow her and pick her up. Piche talked and danced with Alonzo at the bar, and then left in a taxicab with Alonzo and Alonzo's roommate, Antonio Chah. The defendant followed but lost track of Piche, and returned to the bar to find her. When he did not find Piche at the bar, the defendant went home, heard noises coming from upstairs, and called to Piche. Hearing a man calling for Piche, Chah left the third-floor apartment by the back stairs, pushing his way past a person with a bat, and walked around to the front of the house. Piche came downstairs, told the defendant she had obtained $20 from one of the men and was going to get $50 from the other man. She then returned to the third floor.

A few minutes later, the defendant entered the third-floor apartment carrying a "police-type" flashlight.[2] The defendant demanded of the victim, "Where's the money?" The victim said he had no more.[3] The defendant then punched the victim numerous times in the head, chest, and arms. He later told the police he obtained "another two dollars" from the victim. At least two of the victim's many injuries were consistent with being struck by the defendant's flashlight. The defendant told the police that he and Piche got $72 from the victim.

From outside, at the front of the building, Chah heard the victim shout that he was being beaten up and then saw him "tossed out" of the window and land on the cement sidewalk.[4] After the victim's fall, the defendant hid in Lorenzi and Camara's apartment while the police were at the building. A police officer found the victim lying on the sidewalk with a pool of blood beneath his head and glass all around the body and on the front stairs of the building. The officer testified that a "trail of blood" in the third-floor apartment led to a window facing Ash-

[2]That third floor apartment was empty and dark.

[3]The defendant testified that he saw Piche and the victim against the back wall, and Piche's pants were down.

[4]Chah's trial testimony suggested more than one person may have been involved in throwing the victim out the window, as he testified, "*they* threw him out of the window." Similarly, a police officer testified that on September 29, the defendant stated that "we were beating on the guy" when, according to the defendant, the victim kicked out the window and jumped. The judge instructed on joint venture.

The Commonwealth reports that, after the defendant was tried, Jason Lorenzi was indicted for the murder of Alonzo, based on Jody Camara's post-trial statement.

ley Boulevard. The medical examiner testified that the victim's injuries were consistent, variously, with a fall from a third-floor window onto a sidewalk, with various means of blunt trauma, with receiving blows from a closed fist, and with blows from the flashlight found at the defendant's apartment.[5]

2. *Motion to suppress.* The defendant argues it was error for the motion judge to deny his motion to suppress statements that, he asserts, were made while he was intoxicated by alcohol and drugs and were not the product of an uncoerced voluntary waiver of his constitutional rights. The Commonwealth had the burden of demonstrating beyond a reasonable doubt that any Miranda waiver by the defendant was "knowing, intelligent, and voluntary." *Commonwealth* v. *Judge*, 420 Mass. 433, 447 (1995), citing *Miranda* v. *Arizona*, 384 U.S. 436, 475 (1966), *Commonwealth* v. *Tavares*, 385 Mass. 140, 143, cert. denied, 457 U.S. 1137 (1982), and *Commowealth* v. *Cobb*, 374 Mass. 514, 518 (1978). "And, as with voluntariness generally, intoxication bears heavily on the validity of a Miranda waiver, although it is insufficient alone to require a finding of involuntariness." *Commonwealth* v. *Ward*, 426 Mass. 290, 295 (1997), citing *Commonwealth* v. *Shipps*, 399 Mass. 820, 826 (1987).

The motion judge found that the defendant had a serious drug and alcohol problem of some duration at the time of his arrest on September 29, 1992. He also obviously credited the defendant's testimony at the suppression hearing about his drug and alcohol consumption in the two days leading up to the arrest. He nevertheless concluded that, although the defendant perhaps may have been intoxicated by heroin he had ingested that morning, the defendant was not intoxicated to the point his ability to think freely and rationally was impaired, and the judge was persuaded beyond a reasonable doubt that the defendant waived his Miranda rights knowingly and voluntarily.[6] The judge was similarly persuaded beyond a reasonable doubt that the defendant's statements to the police were volun-

---

[5]Traces of human blood were discovered on the base of the flashlight.

[6]A police officer had read a Miranda form aloud, as the defendant read along with the form in front of him; the form incorporated faithfully and fully the rights articulated in *Miranda* v. *Arizona*, 384 U.S. 436, 473 (1966). The form stated, among other things, that he was waiving the listed rights, that he was willing to make a statement, that he did not want a lawyer, that no promises or threats had been made to him, and that no pressure or coercion of any kind had been used against him. The defendant signed the form.

tary.[7] The judge found that the defendant had had no trouble inserting the key and unlocking his vehicle, giving the police his correct social security number, his correct name and address, and his mother's maiden name prior to the statement.[8] The defendant signed the waiver form with a firm and steady hand, and his signature neatly tracked the signature line, reflecting good motor control when he signed the document. When he later signed a form stating he had been advised of his right to use the telephone, his signature was neat, controlled, placed appropriately on the page, and displayed good motor control.

When told he could make a telephone call, the defendant said he would prefer to wait to make the call until after he found out what his bail would be. The judge further found that the defendant's first, false account of events to police on September 29, designed to deflect suspicion from himself, revealed the defendant's rational effort at self-preservation, and his decision to postpone his telephone call clearly reflected rational choice. The defendant described where a flashlight could be found in his apartment, and a later search revealed the flashlight exactly where the defendant had said it would be. His eyes appeared normal and no alcohol odor emanated from his mouth. The defendant showed no signs of intoxication, did not walk unsteadily, and did not slur his speech.[9]

Absent clear error we will accept a judge's findings of fact; we give substantial deference to his ultimate conclusions concerning a motion to suppress. See *Commonwealth* v. *Ward, supra* at 294; *Commonwealth* v. *Mello,* 420 Mass. 375, 381 & n.8 (1995), citing *Commonwealth* v. *Fernette,* 398 Mass. 658, 662-663 (1986). We find no error in the judge's findings (which the defendant does not claim were plainly erroneous), nor his conclusion that the defendant's waiver of Miranda rights was voluntary and that the defendant's statement was voluntary. See

---

[7]The voluntariness of a waiver and the voluntariness of a statement are assessed separately, although on similar bases. See *Commonwealth* v. *Edwards,* 420 Mass. 666, 673 (1995), and cases cited.

[8]The judge's findings were based on a suppression hearing at which two officers who were present when the defendant was read his rights, signed the waiver, and answered questions, testified. One of the testifying officers had also been an arresting officer and brought the defendant to the police station that morning. Both officers concluded the defendant was sober at that time.

[9]The judge also found that on the day prior the defendant had injected part of a bag of heroin and had then driven through the streets of downtown New Bedford without hitting anything or running afoul of any traffic regulations.

*Commonwealth* v. *Ward, supra* at 294-296; *Commonwealth* v. *Smith,* 426 Mass. 76, 82 (1997) ("defendant's intoxication is one factor that bears on the voluntariness of a statement . . . but the fact that a defendant has consumed drugs and alcohol before his arrest does not necessarily mandate a finding that the defendant's confession was involuntary"); *Commonwealth* v. *Judge, supra* at 447-448; *Commonwealth* v. *Mello, supra* at 383-385; *Commonwealth* v. *Shipps, supra* at 825-826.

The defendant also claims that, because of his intoxication, he was unable "to reflect and react" and "adequately protect himself" when the interrogating officers told him that they did not believe the initial account he had given them. This claim fails in light of the judge's determination that the defendant was neither physically nor mentally impaired as a result of any intoxication. Moreover, the police misconduct that the defendant alleges ("[c]oercion in the form of disdain," according to the defendant) is not the type of unfair conduct that requires suppression.

3. *Supplemental jury instructions.* The defendant does not claim on appeal that any of the judge's instructions in the main charge or supplemental charge were incorrect. He claims only that it was error when, in response to a jury question, the judge did not remind the jury of the Commonwealth's burden of proof. After several hours of deliberations, the jury presented questions to the judge concerning clarifying murder in the first and second degrees, noting, "questions unanswered[;] evidence incomplete[;] cannot decide." The judge reinstructed the jury on felony-murder in the first and second degrees (to which there is no claim of error) and then added:

> "As to your question about there being lots of unanswered questions, I'm going to — try to recall my previous instruction that you are to decide this case based solely on the evidence that's presented in court and you're not to speculate about any unanswered questions that still remain."

"The necessity, scope, and character of a judge's supplemental jury instructions are within his or her discretion." *Commonwealth* v. *Watkins,* 425 Mass. 830, 840 (1997), citing *Commonwealth* v. *Thomas,* 21 Mass. App. Ct. 183, 186 (1985). In considering the propriety of particular instructions, we consider the charge as a whole, not isolated portions. See *Commonwealth*

v. *Watkins, supra* at 837, quoting *Commonwealth* v. *Lanoue,* 392 Mass. 583, 591 (1984). See also *Commonwealth* v. *Rosa,* 422 Mass. 18, 27-28 (1996), citing *Commonwealth* v. *Sellon,* 380 Mass. 220, 233-234 (1980) (supplemental instructions to be read in light of entire charge). We see no abuse of discretion in the judge's decision. Cf. *Commonwealth* v. *Oeun Lam,* 420 Mass. 615, 619 (1995), quoting *Commonwealth* v. *Kozec,* 21 Mass. App. Ct. 355, 366 (1985), *S.C.,* 399 Mass. 514 (1987) (no abuse of discretion to refuse to give particular instruction).

Throughout the main instructions, the judge repeatedly emphasized the Commonwealth's burden to prove the defendant's guilt beyond a reasonable doubt. As the defendant concedes, there was nothing in the judge's supplemental instruction that would have changed the jury's understanding of that burden. We discern no abuse of discretion in the judge's decision not to repeat a statement of the Commonwealth's burden in the supplemental instructions. Cf. *Commonwealth* v. *Waite,* 422 Mass. 792, 806 (1996) (no reversible error, although judge used disfavored instruction language, because charge as whole repeatedly emphasized Commonwealth's burden on every element).

4. *Defendant's motion for a new trial.* The defendant asserts it was error to deny his motion for a new trial without an evidentiary hearing,[10] where newly discovered evidence may have cast doubt on the degree of culpability of the defendant. The "newly discovered evidence" was a statement of Jody Camara, an eyewitness in the apartment, made after the defendant's trial and a confirmatory statement from Carol Leslie.[11] We consider first whether the judge's denial of the motion for a new trial was in error and, second, whether it was proper for him to rule without holding an evidentiary hearing.

A new trial may be granted "if it appears that justice may not have been done." Mass. R. Crim. P. 30 (b), 378 Mass. 900 (1979). See *Commonwealth* v. *Pike, ante* 212, 218 (2000), quoting *Commonwealth* v. *Grace,* 397 Mass. 303, 305 (1986). "A defendant seeking a new trial on the ground of newly discovered

---

[10]There was a nonevidentiary hearing on the motion.

[11]Camara told the police that she had not talked to them earlier about the incident because she was afraid and that she would get beaten for talking to the police about it. She said that Lorenzi told her that if he ever served time for the incident, and that imprisonment had anything to do with her, that his family would come and get her and that would be the end, which Camara took to mean, she would be dead.

evidence must establish . . . that the evidence . . . casts real doubt on the justice of the conviction. . . . [T]he judge must find there is a substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial." *Commonwealth* v. *Lo*, 428 Mass. 45, 53 (1998), quoting *Commonwealth* v. *Grace*, *supra* at 305-306. "[A]n appellate court will examine the motion judge's conclusion only to determine whether there has been a significant error of law or other abuse of discretion." *Commonwealth* v. *Grace*, *supra* at 307. See *Commonwealth* v. *Lo*, *supra*, quoting *Commonwealth* v. *Moore*, 408 Mass. 117, 125 (1990) (new trial denial will not be reversed unless "manifestly unjust" or trial infected with prejudicial constitutional error). Where, as here, the motion judge was also the trial judge, we grant special deference to the judge's decision. See *Commonwealth* v. *Lo*, *supra* at 53-54, quoting *Commonwealth* v. *Haley*, 413 Mass. 770, 773 (1992); *Commonwealth* v. *Grace*, *supra*.

Here, it is nearly inconceivable that the jury would have reached a different conclusion had Camara's testimony been available at trial. At trial the defendant intimated that Lorenzi was involved in additional fighting with the victim after the defendant left the third-floor apartment and that Lorenzi was with the victim when the fall from the window took place, but that the defendant was not. Camara's statement would place the defendant there with Lorenzi, both severely beating the victim. As the motion judge correctly observed, Camara's testimony "would directly conflict with the defendant's own testimony," and "would further inculpate the defendant in that it would show that the defendant beat the victim to a state of helplessness and then forced the victim through a third story window."

While Camara's statement asserts that it was Lorenzi who beat the victim with a heavy flashlight, that assertion does not exculpate the defendant for several reasons. First, the medical examiner identified the cause of death as multiple blunt trauma, identifying only two of the victim's various injuries as consistent with blows from a flashlight of the type found in the defendant's apartment. Thus, the victim's injuries were not definitively connected to blows from a flashlight alone. Second, the defendant admitted to police he had a flashlight with him during his battery of the victim prior to Lorenzi's arrival on the scene, although he claims he did not strike the victim with it. Thus, Camara's statement is not inconsistent with the defendant's

striking the victim with a flashlight before Lorenzi did.[12] Third, and most damning, Camara states that, while Lorenzi beat the victim with a flashlight, the defendant repeatedly whipped the victim with a motorcycle chain. She states that the defendant and Lorenzi were both striking the victim when he went out the window backward, although Camara was not sure whether they threw, punched, or pushed him out. Thus, Camara's statement, at best, might remove one dangerous weapon from the defendant's hands — a flashlight — and replace it with another — a chain.[13] See *Commonwealth* v. *Salone*, 26 Mass. App. Ct. 926, 930 (1988), citing *Commonwealth* v. *A Juvenile*, 365 Mass. 421, 440 (1974) (language in indictment charging assault and battery by means of dangerous weapon specifying particular weapon used is superfluous). Her statement might add a coventurer to the beating of the victim.[14] See *Commonwealth* v. *Johnson*, 425 Mass. 609, 610-611 (1997) (discussing joint venture of murder and assault and battery by means of dangerous weapon); *Commonwealth* v. *Sexton*, 425 Mass. 146, 152 (1997) (assault and battery by means of dangerous weapon under joint venture theory). But this does not help the defendant.

Moreover, Camara's statement does not cast doubt on the defendant's involvement in an armed robbery.[15] She states she did not know why Lorenzi and the defendant were beating the victim, and that it was Lorenzi who searched through the victim's pockets and took his change as he lay on the sidewalk.

[12]Camara's statement suggests a second flashlight may have been involved, because she states that Lorenzi had thrown a flashlight into a pond, whereas the flashlight entered in evidence at trial was recovered from the defendant's apartment.

[13]General Laws c. 265, § 15A, does not define the term "dangerous weapon," for assault and battery by means of a dangerous weapon, but case law has determined that ordinarily innocuous items, such as a baseball bat, a riding crop, or a lighted cigarette, "can be considered dangerous weapons when used in an improper and dangerous manner." *Commonwealth* v. *Sexton*, 425 Mass. 146, 149 (1997), and cases cited. We have applied similar analysis to cases of armed robbery, which requires "being armed with a dangerous weapon," G. L. c. 265, § 17. See *Commonwealth* v. *Tarrant*, 367 Mass. 411, 414-418 (1975) (German shepherd).

[14]Camara stated that she, Lorenzi, the defendant, and Piche discussed what they would tell police, and that the defendant and Piche wanted Lorenzi and Camara to tell the police that they were not around.

[15]"Whoever, being armed with a dangerous weapon, assaults another and robs, steals or takes from his person money or other property which may be the subject of larceny" may be convicted of armed robbery. G. L. c. 265, § 17.

But these additions do not contradict the testimony of the police who testified that the defendant admitted he demanded of the victim, "Where's the money?," while holding the flashlight. In short, the Camara statement does not "carry a measure of strength in support of the defendant's position," nor "cast[] real doubt on the justice of the conviction," and thus it does not constitute new evidence upon which a new trial could properly be ordered. *Commonwealth* v. *Grace, supra* at 305.

Beyond these insurmountable problems with the Camara statement from the defendant's standpoint, her statement cannot properly be considered new evidence because new evidence must have been "unknown to the defendant or his counsel and not reasonably discoverable by them at the time of trial . . . . The defendant has the burden of proving that reasonable pretrial diligence would not have uncovered the evidence." *Commonwealth* v. *Grace, supra* at 306. See *Commonwealth* v. *Pike, supra* at 218; *Commonwealth* v. *Genius,* 402 Mass. 711, 714 (1988); *Commonwealth* v. *Williams,* 399 Mass. 60, 64 (1987). The defendant asserts that Camara's testimony was new and unavailable at trial because she had invoked her privilege under the Fifth Amendment to the United States Constitution at the defendant's "bind-over hearing" and at trial "was unavailable and her whereabouts unknown." As the motion judge correctly noted, however, defense counsel's affidavit did not set forth what steps, if any, were taken at the time of trial to interview or to locate Camara. Nor may we assume that Camara would continue to assert her Fifth Amendment privilege if located for trial. The defendant has not shown "that reasonable pretrial diligence would not have uncovered the evidence." *Commonwealth* v. *Grace, supra.* See *Commonwealth* v. *Pike, supra* at 218; *Commonwealth* v. *Ortiz,* 393 Mass. 523, 538 (1984). More important, the proffered statement from Camara recounts events in which the defendant participated. Thus, the content of this evidence was known to the defendant at trial, and it can therefore not be said to be new evidence on which to order a new trial. See *Commonwealth* v. *Grace, supra* at 306.

The judge may rule on the issues presented on the basis of affidavits, without a further hearing, "if no substantial issue is raised by the motion or affidavits." Mass. R. Crim. P. 30 (c) (3), 378 Mass. 900 (1979). See *Commonwealth* v. *Toney,* 385 Mass. 575, 579 (1982). The decision on whether to hold an evidentiary hearing is left to the sound discretion of the judge. See *id.*;

*Commonwealth* v. *Stewart*, 383 Mass. 253, 257 (1981). In explaining his denial of an evidentiary hearing, the judge noted that Camara's statement was inculpatory and cumulative of evidence at trial and that it cannot be considered newly discovered because the defendant knew of it at trial. He concluded that the motions and affidavits raised no substantial issue. Given our conclusions about the import of Camara's statements, we agree with the judge and see no error in his decision to forgo an evidentiary hearing.

5. *Duplicative convictions*. The Commonwealth concedes that the armed robbery was a lesser included offense of the felony-murder based on an armed and unarmed robbery and a separate conviction for armed robbery was therefore duplicative.[16] We agree and vacate the armed robbery conviction and the sentence thereon. "When a murder conviction is based on a felony-murder theory, the underlying felony, whatever it may be, is always a lesser included offense and the conviction for that felony, in addition to the conviction of murder, is duplicative." *Commonwealth* v. *Gunter*, 427 Mass. 259, 276 (1998), citing *Commonwealth* v. *Mello*, 420 Mass. 375, 398 (1995).

The defendant also argues that the crime of assault and battery by means of a dangerous weapon was so similar to the other charges here as to be duplicative, and should be dismissed. "[T]o determine whether a defendant may be convicted of two statutory offenses arising from a single incident, 'the long-prevailing test in this Commonwealth is whether each crime requires proof of an additional fact that the other does not.' " *Commonwealth* v. *Crocker*, 384 Mass. 353, 357 (1981), quoting *Commonwealth* v. *Jones*, 382 Mass. 387, 393 (1981). See *Morey* v. *Commonwealth*, 108 Mass. 433, 434 (1871). The defendant concedes that assault and battery by means of a dangerous weapon is not technically a lesser included offense to the armed robbery, but argues that here the crimes are so closely linked to a single event as to constitute a single crime.

We disagree. The conviction of assault and battery by means of a dangerous weapon is not duplicative of the conviction of armed robbery because each crime required proof of a fact that the other did not. *Commonwealth* v. *Crocker*, *supra* at 357; *Mo-*

---

[16]The defendant was not charged with a separate unarmed robbery, and thus the specification of unarmed robbery as a basis for the felony-murder conviction appears to be superfluous, particularly in light of the jury's conclusion that the defendant did commit an armed robbery.

*rey* v. *Commonwealth, supra* at 434. For the former an assault and battery by means of a dangerous weapon must have occurred, but there need not be any larceny; for the latter an assault with a dangerous weapon and larceny must have occurred, but there need not be any battery. Compare *Commonwealth* v. *Appleby*, 380 Mass. 296, 308 (1980) (defining elements of assault and battery by means of dangerous weapon) with G. L. c. 265, § 17 (defining elements of armed robbery). For similar reasons, the felony-murder premised on an armed robbery is not duplicative of the assault and battery by means of a dangerous weapon.[17] Moreover, the jury could have reasonably concluded that the crimes were not so closely linked as to create a single crime. See *Commonwealth* v. *St. Pierre*, 377 Mass. 650, 662-663 (1979). Cf. *Commonwealth* v. *Maldonado*, 429 Mass. 502, 509-510 (1999); *Commonwealth* v. *Sanchez*, 405 Mass. 369, 381 (1989); *Commonwealth* v. *Thomas*, 401 Mass. 109, 120 (1987). Here there was evidence of a series of violent acts including at least two blows with a heavy flashlight that could have been the basis of the conviction of assault and battery by means of a dangerous weapon. There was evidence of at least one demand for and taking of money by the defendant while carrying a flashlight that, if used in a dangerous fashion, could have constituted a dangerous weapon. The latter could have been the basis of the armed robbery conviction. These acts were not necessarily so linked as to constitute a single crime. Nor was every blow from the flashlight necessarily connected to the armed robbery that led to the victim's death. We conclude that the conviction of assault and battery by means of a dangerous weapon was not duplicative of the felony-murder conviction.

6. *Section 33E review.* Finally, the defendant requests this court to exercise its authority pursuant to G. L. c. 278, § 33E, to order a new trial or reduce the degree of murder. Nothing in our review of the record for this case pursuant to § 33E suggests that justice requires the ordering of a new trial or a reduction in the degree of murder.

---

[17]For a conviction of that kind of felony-murder, a death must have resulted, and a larceny and assault must have occurred sufficient to satisfy the armed robbery component, but there need not be any battery by the defendant. See G. L. c. 265, § 1; G. L. c. 265, § 17. In contrast, a conviction of assault and battery by means of a dangerous weapon requires the defendant to have committed a battery, but the battery need not lead to death, nor must any larceny be involved. See G. L. c. 265, § 15A; *Commonwealth* v. *Appleby*, 380 Mass. 296, 308 (1980).

For the foregoing reasons we affirm the denial of the defendant's motion for a new trial. We vacate both the defendant's conviction of and sentence for armed robbery, and affirm his convictions of first degree felony-murder and assault and battery by means of a dangerous weapon.

*So ordered.*